# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 04-74963-SCS |
| HERBERT T. & JEAN C. GILL, | ) | |
| | ) | |
| *Debtors.* | ) | |
| | ) | |
| JEAN C. GILL, | ) | |
| | ) | APN 04-7155-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NELNET LOAN SERVICES, INC., | ) | |
| STATE OF COLORADO, | ) | |
| COLORADO STUDENT LOAN PROGRAM, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on April 12, 2005, on the Plaintiff's Complaint to Determine Dischargeability of Debt under Section 523(a)(8) of the United States Bankruptcy Code. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and of the pleadings submitted by each party, the Court makes the following findings of fact and conclusions of law.

## I.

## PARTIES AND PROCEDURAL HISTORY

Jean C. Gill ("Mrs. Gill") and her husband, Herbert T. Gill ("Mr. Gill"), filed a joint

Chapter 7 bankruptcy petition on August 16, 2004. Mr. Gill and Mrs. Gill received a

discharge of all of their dischargeable debts on November 29, 2004. To help finance her

daughter's college education at the University of Northern Colorado, Mrs. Gill took out a

Federal PLUS loan (the "Loan") through the Colorado Student Loan Program ("CSLP") in

1998.[1] On October 28, 2004, Mrs. Gill filed an adversary proceeding, in which she prayed

that the Loan be discharged.[2]

In her complaint, Mrs. Gill asserts that Mr. Gill is "completely and permanently

disabled and unable to work." Mrs. Gill also asserts that Mr. Gill's only income is in the

form of Social Security disability, which is insufficient to maintain him, and as a result, he

is financially dependent on Mrs. Gill's income from her employment. Compl. ¶¶ 5, 7. Mrs.

Gill states that the Loan was incurred prior to Mr. Gill becoming disabled. Compl. ¶ 5. Mrs.

Gill further asserts that Mr. Gill incurs "significant medical expenses" each month. Compl.

---

[1] In its Answer, the Defendant, State of Colorado, Colorado Student Loan Program, stated that the name of the program had been changed and is now known as College Access Network. The Answer also stated that College Access Network was the assignor and guarantor of the Loan taken by Mrs. Gill. Mrs. Gill did not dispute either of these assertions during the trial. For purposes of consistency with the Court's docket, this Memorandum Opinion will refer to the Defendant as Colorado Student Loan Program or "CSLP."

[2] Mrs. Gill filed an amended Complaint on November 1, 2004, to correct a clerical error in the original Complaint that referenced the incorrect underlying bankruptcy case number.

¶ 6. Mrs. Gill claims that she does not have sufficient income to make payments on the Loan after essential living expenses are paid for her and her husband. Compl. ¶ 7. Thus, Mrs. Gill requests that the Loan be discharged because undue hardship would result from the repayment of the Loan. Compl. ¶ 7. Prior to trial, the parties stipulated that the outstanding balance of the Loan was $14,800.70 through March 29, 2005. The parties also stipulated that the total indebtedness to CSLP was $17,400.00, which included collection costs and interest that was accruing at a variable interest rate of 4.17%.[3] Finally, the parties stated that there were no objections to any of the exhibits filed by the parties with the Court prior to trial. Therefore, all of the exhibited were deemed admitted.[4]

---

[3] The parties also agreed that the maximum rate at which interest could accrue on the Loan was 7%.

[4] Counsel for Mrs. Gill presented seven exhibits. Plaintiff's Exhibit 1 is the joint Chapter 7 bankruptcy petition filed by Mr. and Mrs. Gill, and Schedule F, the latter of which lists Nelnet Loan Services, Inc., as a creditor for a "parent loan" in the amount of $14,427.01. Plaintiff's Exhibit 2 is the Plaintiff's Complaint to Determine Dischargeability of Debt. Plaintiff's Exhibit 3 is Schedule I from the debtors' bankruptcy schedules. Plaintiff's Exhibit 4 is Schedule J from the debtors' bankruptcy schedules. Plaintiff's Exhibit 5 is the debtors' 2004 Federal tax return, including their W-2 forms and Mr. Gill's 2004 Social Security Benefit Statement. Plaintiff's Exhibit 6 is a letter from Mrs. Gill's former employer advising her of her termination due to a reduction in force. Finally, Plaintiff's Exhibit 7 consists of documents from the Department of Social Services regarding Mrs. Gill's obligation to contribute toward her husband's medical expenses.

Counsel for CSLP presented nine exhibits. Defendant's Exhibit A is the application and promissory note for the Loan in the amount of $15,704.00, dated August 4, 1998. Defendant's Exhibit B is Schedule J from the debtors' bankruptcy schedules. Defendant's Exhibit C is a copy of Mrs. Gill's pay stub from Sentara Healthcare, dated January 27, 2005. Defendant's Exhibit D is a Social Security Benefit Award letter addressed to Mr. Gill. Defendant's Exhibit E is the debtors' 2001 Federal tax return. Defendant's Exhibit F is the debtors' 2002 Federal tax return. Defendant's Exhibit G is the debtors' 2003 Federal tax return. Defendant's Exhibit H is the debtors' 2004 Federal tax return. Defendant's Exhibit I consists of bank statements from the debtors' bank account.

## II.

## FINDINGS OF FACT

### A. *History of Loan and Problems Regarding Repayment*

Mrs. Gill, who is currently 55 years old, took out a parent loan for $15,704.00 in 1998

to help finance her daughter's college education at the University of Northern Colorado. *See*

Def. Ex. A. Mrs. Gill testified that she began repaying the Loan in 1998, during her

daughter's first year of college. Mrs. Gill's daughter withdrew from school in the second

semester of her junior year in 2001. According to Mrs. Gill, her daughter never finished

college. Her daughter is now twenty-four years old and lives with Mrs. Gill and her

husband.[5] Mrs. Gill's daughter is employed, but according to Mrs. Gill, she makes only

minimum wage.

Mrs. Gill testified that her health as well as her husband's medical condition has

hindered her repayment of the Loan. Mrs. Gill testified that her health is "questionable," as

she suffers from fibromyalgia, but stated that "there isn't much they can do about it." She

also stated that she has sleep apnea and does not rest well. She takes no medications for

either of these conditions, though she does have a machine that requires yearly maintenance

and repairs. Mrs. Gill did not elaborate as to the machine's purpose or function. Mrs. Gill

further testified that she has issues regarding menopause. Mrs. Gill has no health insurance

---

[5] Mrs. Gill testified that her daughter is her only child and is from a marriage prior to that
to Mr. Gill. Mrs. Gill testified that Mr. Gill has a child from a previous marriage that lives out of
state, but that Mr. Gill has no child support obligation for that child.

4

for herself and pays out-of-pocket when she visits a doctor.

Due to these health problems and feelings of being "overwhelmed and exhausted,"
Mrs. Gill testified that she left her employment in 2001. The debtors moved to Wilmington,
North Carolina in 2002. After their move, Mrs. Gill remained unemployed for approximately
one year, and the family used the proceeds from selling their house in Virginia Beach,
Virginia, to pay for living expenses. Mrs. Gill became re-employed in August, 2003, when
she returned to Virginia Beach; Mr. Gill was still in a rehabilitation facility at that time.

Mr. Gill was involved in a serious motorcycle accident in April, 2002, in North
Carolina, which left him paralyzed from the mid-chest area through the lower portion of his
body. He is confined to a wheelchair. Mr. Gill testified that he also has some difficulty
using his right arm and that he suffers from chronic pain. According to Mrs. Gill, Mr. Gill
spent fourteen months in the hospital following the accident and thereafter spent several
more months in a rehabilitation facility. Mr. Gill returned to his home in Virginia Beach in
January, 2004.

## B. *History of Loan Repayment*

The record is sparse regarding repayment of the Loan. No payment record was
presented or entered into evidence. Mrs. Gill testified that she began repaying the Loan
during her daughter's first year of college. Mrs. Gill stated that she paid the required
repayment amount from 1998 until 2001, and she recalled that the amount was between
$190.00 and $200.00. Mrs. Gill believed that after approximately three years of payments,

the Loan balance was reduced to between $11,000.00 and $12,000.00. On this subject,
counsel for CSLP offered, and Mrs. Gill did not dispute, that the required monthly payment
amount during the time period that Mrs. Gill made payments on the Loan was approximately
$204.00, and that the first monthly payment was due on the Loan in February, 1999.

Mrs. Gill testified that, prior to filing bankruptcy, she contacted CSLP and had been
in least somewhat regular contact with the company since 2001. Mrs. Gill did not recall
when she last made contact with CSLP, but recollected that she was told to "try to keep up
with the interest." Mrs. Gill made elusive reference to deferments that she received, but did
not present further evidence as to this issue.

As to whether she could afford to pay a regular monthly Loan payment at the current
time, Mrs. Gill testified that it would "depend on the amount" and "lots of other variables."

### C. *Mrs. Gill's Education and Employment History*

Mrs. Gill testified that she has a Bachelor's degree in Spanish, and a Master's degree
in Counseling, which she earned from Appalachian State University. Mrs. Gill also has a
Doctor of Education degree in Psychology from the University of Northern Colorado, which
she earned in 1978.

After earning her Doctoral degree, Mrs. Gill began working as a social worker with
the Department of Social Services in Virginia Beach. She testified that she was earning
approximately $27,000.00 per year when she left that job in 1985 and went into private
counseling practice. During her time in private practice, Mrs. Gill testified that she shared

6

rented space with other counselors. Her gross income varied from $30,000.00 to $50,000.00.
She remained in private practice until 2001, when she left work due to her medical problems.

Mrs. Gill resumed employment in August, 2003, when she returned to the Virginia
Beach area after her husband's accident. She began working for the ValueOptions company
as a care manager and remained employed there until her termination due to a reduction in
force on August 31, 2004. *See* Pl. Ex. 6. Mrs. Gill's employment ended approximately two
weeks after she and Mr. Gill filed their joint Chapter 7 petition. When Mrs. Gill worked at
ValueOptions, her monthly net income, as evidenced by the debtors' Schedule I of their
bankruptcy schedules, was $2,066.63. *See* Pl. Ex. 3.

Mrs. Gill is currently employed by Sentara Healthcare ("Sentara") as an Employment
Assistance Program ("EAP") counselor, in which she counsels Sentara employees. She
stated that she earns approximately $1,000.00 per month at this job. She also maintains a
private practice on Saturdays through Dominion Psychiatric, from which she earns between
$100.00 and $400.00 per month. Mrs. Gill testified that she works between thirteen and
fifteen hours per week at Sentara, earning approximately $23.00 per hour. Her Sentara pay
stub confirms that Mrs. Gill's hourly wage is $23.63. Def. Ex. C. Mrs. Gill testified that the
27.75 hours for the two week period beginning January 9, 2005, and ending January 22,
2005, (as shown on Defendant's Exhibit C) was the highest amount of hours that she has
worked at Sentara since beginning employment there.

Mrs. Gill testified that she works between one and five hours each Saturday in her

7

private practice, depending upon the number of clients that she has at any given time. Mrs.

Gill stated that she averages approximately three hours per week at her private practice and

that her hourly wage is approximately $27.00 per hour. According to Mrs. Gill, the last

check that she received from Dominion Psychiatric was in the amount of $263.00 for the last

two weeks in March, 2005. No evidence such as a pay stub was introduced from either party

to corroborate Mrs. Gill's assertions regarding her practice at Dominion Psychiatric.

Mrs. Gill stated that she could work a maximum of twenty hours per week total

between the two jobs and cited three reasons as to why she works a reduced schedule. First,

Mrs. Gill  states that she was hired by Sentara to work only a certain number of hours and

that the total number of hours she works each week is determined by her supervisor. She

testified that she has made it known to her supervisor that she would like to work more hours

if they became available; however, there were other employees performing the same job as

Mrs. Gill that could also receive the additional work hours if they became available. When

asked by CSLP's counsel how many more hours per week she would be willing to work at

Sentara, Mrs. Gill stated that she could work two more hours per week.

Second, she states that Mr. Gill will lose his Medicaid benefits if their household

income exceeds a certain amount. Mrs. Gill was unable to elaborate as to what income level

would cause a total loss of benefits. She testified, however, that, when she worked for

ValueOptions, Medicaid instructed her that she would have to pay approximately $850.00

8

per month for her husband's nursing care. *See* Pl. Ex. 7.[6] Mrs. Gill also stated that, if she were to earn a higher income, either in her current job(s) or in different employment, the increase in the required amount of reimbursement would, in her mind, still leave her with no disposable income with which to repay the Loan.

Third, Mrs. Gill testified that her reduced work schedule allows her the flexibility to help care for her husband. While Mrs. Gill stated that she can care for her husband at night, Medicaid provides a nurse to help care for Mr. Gill during the day. Mr. Gill stated that he receives approximately three hours of aid per day, three to five days per week from a home health aid. Both Mr. and Mrs. Gill testified that sometimes the home health aid does not show up to care for Mr. Gill, and Mrs. Gill's work schedule allows her to stay home when the aid does not arrive. However, Mrs. Gill also testified that her husband does not require full-time care.

### D. *Mr. Gill's Physical Healthcare Needs and Expenses*

Mr. Gill testified that he is unable to get out of bed on his own. He cannot shower and dress without assistance. He is generally unable to cook, though he is able to use the microwave oven. Mr. Gill stated that, on the days that a home health aid comes to his home, the aid fixes his breakfast. He did not further elaborate on the other duties of the aid. Mr. Gill is 55 years old, and he stated that his medical prognosis is a life expectancy of twenty

---

[6] The document, which is from the Commonwealth of Virginia Department of Social Services, is dated August 25, 2004, and states that Mrs. Gill's contribution toward her husband's medical as of that date was $827.00, not $850.00 as Mrs. Gill testified.

more years, provided that he maintains his current quality of life. Mr. Gill expects no improvement in his medical condition.

Mrs. Gill testified that Mr. Gill has both Medicare and Medicaid. His Medicaid benefits provide his nursing care, which costs approximately $3,000.00 per month. In referencing Plaintiff's Exhibit 7, Mrs. Gill stated that the documents reflected the expected contribution from her income toward her husband's care at that time, which was $55.00 per month. At the time of trial, Mrs. Gill stated that her contribution toward the cost of Mr. Gill's health care is zero; however, her expected contribution is recalculated on a quarterly basis because her income varies.

### E. *Mr. Gill's Employment and Income*

Mr. Gill is not employed. However, he volunteers at the Contemporary Arts Center in Virginia Beach two to three days per week for approximately two hours per day. He stated that this position will terminate at the end of the school year. Mr. Gill transports himself via his wheelchair to the Arts Center, which is located in close proximity to his home. He is unable to perform his volunteer work in the winter because he cannot tolerate the cold temperatures. At the Arts Center, he guides school children on tours and explains the art exhibits to them. He receives no compensation for his services, though he has inquired as to compensation for his services in the past. Mr. Gill stated that the maximum amount of time that he can volunteer is two hours per day because he gets tired easily and is "exhausted" when he gets home.

Mr. Gill testified that, prior to his accident, he was employed as a teacher and has more than twenty-four years experience in that field. After he and his wife moved to North Carolina, he stated that he had "good prospects" for obtaining a teaching position there and worked as a substitute teacher just prior to his accident. Since recovering from his accident, he states that he has searched for a teaching assistant position and continues to apply for such positions. In addition to the problems he suffers as a result of his injury, he feels that he has been unsuccessful in finding a job as a teaching assistant because the schools can hire new college graduates for a lower salary that what he would be paid because of his teaching experience.

Mr. Gill further testified that he has no other potential income beyond his Social Security Disability. According to Schedule I in the debtors' bankruptcy schedules, Mr. Gill received $1,336.00 per month in Social Security Disability in 2004. Mrs. Gill testified that Mr. Gill's monthly Social Security Disability income increased in January, 2005, to $1,372.00. *See* Def. Ex. D.

According to Mrs. Gill, Mr. Gill has a separate bank account into which his Social Security Disability checks are deposited. Mrs. Gill testified that she occasionally withdraws money from that account and deposits the money into her account to pay their monthly household expenses. Mrs. Gill stated that she withdraws approximately $500.00 per month from Mr. Gill's account to use toward their expenses.

11

F. *Bankruptcy Schedules and Testimony Regarding Expenses*

The bankruptcy schedules filed by the debtors reveal that the entirety of the scheduled debt in their Chapter 7 case was unsecured debt. Schedule F of the debtors' bankruptcy schedules reveals that in addition to the Loan, the debtors had $34,170.19 in credit card debt and $466.00 in medical expenses. The total debt listed on Schedule F was $49,063.20. Pl. Ex. 1.

Schedule I of the bankruptcy schedules indicates that, at the time of the bankruptcy filing, the debtors' combined monthly income was $3,402.63. This amount consisted of $2,066.63 monthly net income from Mrs. Gill's employment, and $1,336.00 from Mr. Gill's monthly Social Security Disability income. Pl. Ex. 3.

Schedule J lists total monthly expenses for the debtors of $3,349.00. These expenses are itemized as follows:

|  |  |  |
|---|---|---|
| | Rent or home mortgage payment | $1,000.00 |
| Utilities: | Electricity and heating fuel | $ 200.00 |
| | Water and sewer | $ 40.00 |
| | Telephone | $ 200.00 |
| | Other: Cable | $ 48.00 |
| | Internet | $ 23.00 |
| | Home maintenance (repairs and upkeep) | $ 50.00 |
| | Food | $ 500.00 |
| | Clothing | $ 100.00 |
| | Laundry and dry cleaning | $ 0 |
| | Medical and dental expenses | $ 500.00 |
| | Transportation (not including car payments) | $ 100.00 |
| | Recreation, clubs, entertainment, newspapers | $ 100.00 |
| | Charitable contributions | $ 0 |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| | Homeowner's or renter's | $ 0 |

| | | |
|---|---|---|
| Life | $ | 8 |
| Health | $ | 380.00 |
| Auto | $ | 100.00 |
| Taxes | $ | 0 |
| Installment Payments | $ | 0 |
| Alimony, maintenance, and support to others | $ | 0 |
| Payments of support for additional dependents not living at your home | $ | 0 |
| Regular expenses from operation of business, profession or farm | $ | 0 |

Pl. Ex. 4.

Mrs. Gill provided further testimony regarding the debtors' monthly expenses. The debtors continue to rent the same residence as when they filed bankruptcy. Mrs. Gill stated that, while the house is not handicapped accessible, the debtors have "made it the best they can." The debtors have inquired into other housing options but have deemed moving to be too expensive. There is no evidence that Mrs. Gill's emancipated daughter contributes any amount toward the monthly rent expense.

Mrs. Gill testified that the electricity, water, and sewer expenses were approximately the same at the time of the trial as they were when the bankruptcy was filed. Likewise, the home maintenance expense remained approximately the same at the time of trial. Mrs. Gill elaborated that the debtors will eventually have to make repairs to their rented residence because of damage done by Mr. Gill's wheelchair. There is likewise no evidence that Mrs. Gill's daughter contributes any amount toward the utility or home maintenance expenses.

As to the $200.00 monthly telephone expense, Mrs. Gill explained that this amount referred to a cell phone, which was the only telephone that the debtors had at the time of

13

filing. Mrs. Gill stated that she signed the cell phone contract when her husband was in the

hospital. According to Mrs. Gill, the debtors are working to reduce this expense and either

had or would imminently sign a new cell phone contract obligating them to a monthly cell

phone payment of $180.00. This amount includes cell phone service for the debtors as well

as for Mrs. Gill's daughter. Mrs. Gill testified that her daughter contributes $35 toward the

monthly cell phone expense. As to the cable and internet expense, Mrs. Gill testified that

those expenses are now part of a "bundled" package that includes land-line telephone, cable,

and internet service for a total monthly amount of $117.00. No evidence was adduced at trial

that Mrs. Gill's daughter contributes to the latter expenses.

As to the monthly grocery expense of $500.00, Mrs. Gill testified that the weekly

grocery bill for her and Mr. Gill was approximately $150.00, largely because the debtors

consume mostly organic foods. The monthly grocery expense included in Schedule J does

not include groceries for her daughter, according to Mrs. Gill, even though she resides with

the debtors.

Mrs. Gill testified that the debtors' monthly clothing expense remains the same as at

the time of filing, as does their life insurance and car insurance expenses. According to Mrs.

Gill, the debtors' currently incur a lower monthly recreation expense, but incur higher

transportation expenses because of the rising cost of gasoline.

As to the debtors' medical and dental expenses, Mrs. Gill elaborated that the expense

of $500.00 has probably decreased. Mrs. Gill testified that she has approximately $10,000.00

14

in dental work that she needs to have performed, but due to her financial situation, she does
not anticipate incurring this expense in the future.

Regarding the health insurance expense, Mrs. Gill stated that the $380.00 expense
includes the monthly premium for her emancipated daughter's Blue Cross/Blue Shield health
insurance premium, which is currently $250.00, because her daughter has health problems,
specifically, diabetes. At the time of filing, her daughter's health insurance premium was
$213.00 per month. Mrs. Gill has no health insurance for herself.

When asked about additional expenses that were not included on Schedule J, Mrs. Gill
stated that she recently paid $400.00 in Federal income tax, a fact confirmed by the debtors'
2004 Federal income tax return. *See* Def. Ex. H. She also incurred a recent expense of
$67.00 for personal property taxes. Mrs. Gill also testified that her current vehicle is a 1994
model that has 170,000 miles and is in poor condition.

### G. *Debtors' Tax Returns*

Both Mrs. Gill and CSLP submitted the debtors' 2004 Federal tax return as an exhibit.
In addition, CSLP also submitted the debtors' Federal tax returns for the years of 2001, 2002,
and 2003. Mrs. Gill provided brief testimony as to each of the tax returns.

The 2001 Federal tax return lists total wages for the debtors of $27,136.00. Def. Ex.
E. Mrs. Gill testified that the wages listed included earnings by both her and Mr. Gill. She
elaborated that she was only employed through March, 2001, as that was the year that she left
her job due to medical issues.

15

The debtors' 2002 Federal tax return lists total wages of only $263.00. Def. Ex. F.
According to Mrs. Gill, she was not employed during 2002. Her husband's accident
occurred in 2002, and thus, he was unemployed for a majority of the year.

The 2003 Federal tax return reflects total wages of $5,161.00. Def. Ex. G. Mrs. Gill
testified that she was the sole wage earner in 2003. Mrs. Gill also testified that the capital
gain of $12,166.00 listed on the tax return resulted from the sale of her husband's farm,
which was sold so that Mr. Gill could qualify for Medicare coverage.

The entire amount of wages listed on the 2004 tax return, $26,984.00, was earned by
Mrs. Gill, she testified. Mrs. Gill stated that her wages will not exceed this amount in 2005,
as she is currently earning less than she earned in 2004. Mrs. Gill also pointed out that she
was working a reduced, 32-hour per week schedule in her employment with ValueOptions.
Mrs. Gill confirmed that Mr. Gill received Social Security Disability income in the amount
of $16,033.00, and that the taxable amount, as reflected on the tax return, was $1,501.00.
Pl. Ex. 5; Def. Ex. H.

## H. *Bank Account Evidence*

CSLP also submitted as evidence the debtors' bank account information from 2004,
including copies of the bank statements for each month of that year. Def. Ex. I. The exhibit
also contains a summary of the deposits and the total amount paid out for each month in
2004. According to the summary, the debtors deposited a total of $39,175.42 in 2004. The
debtors paid out a total of $36,486.52. On average, the debtors deposited $3,264.62 and paid

16

out $3,040.54, for an average monthly excess of $224.08. Def. Ex. I. No testimony was given by either of the debtors regarding these records.

The copies of the bank statements reveal that not only are the debtors' names listed on the account, but Mrs. Gill's daughter, Bree Holcombe, is also listed on the account. An examination of the bank records reveals that Miss Holcombe apparently has access to and the ability to withdraw funds from the account, as her name and signature appear on several check copies included with the exhibit. Along these lines, the sources of the deposits are not wholly revealed; there are, however, deposits that are noted from the ValueOptions company where Mrs. Gill was employed as well as "Sent-Health Sys." To be sure, while some of the deposits are smaller in nature and may be consistent with deposits that could be made from a minimum wage job, as Mrs. Gill testified her daughter works, there is no conclusive evidence in the record to confirm the nature and source of the deposits. The deposits could also be funds transferred from Mr. Gill's bank account, but again, no conclusive evidence confirms this fact.

Further examination of the bank records reveals the payment of several expenses purportedly for Miss Holcombe, as evidenced by the notations in the memorandum lines on the checks. For example, four checks on the January, 2004, statement reveal that a total of $385.30 was paid on Miss Holcombe's behalf, including a $213.00 payment to "Anthem" (presumably a health insurance premium payment).

17

## III.

## ARGUMENTS

Mrs. Gill, by counsel, argues that she and Mr. Gill would suffer undue hardship if they had to repay the Loan from CSLP. While Mrs. Gill stated that she has, in previous years, earned more income that she earns in her present employment, she is desirous that her husband retain his Medicare/Medicaid eligibility. She also cites her own medical issues as an additional reason why she does not currently earn as much income as in previous years. Mrs. Gill further argues that even if she earned additional income, she would be required to use the excess funds to reimburse Medicaid for Mr. Gill's nursing care, and thus, may still be unable to repay the Loan. Finally, Mrs. Gill highlights that the fact that the Loan was in deferment for a period of time.

CSLP, by counsel, argues that the debtors' income and expenses should be scrutinized in light of the fact that, until February, 2005, when discovery was conducted, the debtors maintained that their income and expenses had remained constant. CSLP further argues that Mrs. Gill's daughter is of an emancipated age and has some college education, and therefore, should support herself instead of relying on her mother and Mr. Gill. CSLP points out that Mrs. Gill is currently paying more for her daughter's monthly health insurance premium than the amount of the Loan payment. CSLP also argues that the $200.00 monthly telephone expense is unreasonable.

CSLP also questions the origin of the approximate $40,000.00 in deposits into the

debtors' checking accounts during 2004. CSLP further questions the use of the remaining money from Mr. Gill's account after the debtors' household expenses are paid. Further, on the issue of income, CSLP argues that Mrs. Gill needs to maximize her work hours beyond her current 20-hour per week schedule. CSLP points out that, if Mrs. Gill were to work 32 hours per week, she could earn approximately $2,200 per month, and when combined with Mr. Gill's income, would have monthly income of almost $4,000.00.

As to the Loan, CSLP states that the original term of the promissory note was ten years. When Mrs. Gill signed the promissory note, she obligated herself to pay a total of 112 payments of $204.00, with a final installment payment of $314.00. Finally, counsel for CSLP clarified to the Court that the balance of the Loan as of March 29, 2005, was $14,623.61 plus accrued interest of $177.09. Collection costs as of the date of trial, according to CSLP, were $2,581.24. Therefore, the total outstanding balance of the Loan including collection costs is $17,381.94.

In her rebuttal argument, Mrs. Gill, by counsel, responds that her income fluctuates some but not to a large degree, thus, the income calculations provided are accurate. Mrs. Gill also points out that an insufficient amount of taxes are withheld from her paychecks, which resulted in a Federal tax payment of approximately $400.00 for 2004.

When questioned during her rebuttal argument, Mrs. Gill was unable to shed any light on the amount of income that would result in her husband losing his Medicare/Medicaid eligibility. She could only offer, based on her previous employment, she would have to pay

19

$827.00 per month toward Mr. Gill's health care if she currently made a salary comparable to what she earned at ValueOptions. Currently, based on her income, Mrs. Gill pays nothing for her husband's medical care.

## IV.

## CONCLUSIONS OF LAW

### A. § 523(a)(8)

#### *Undue Hardship*

Student loans generally are nondischargeable debts and pass through the bankruptcy process unaffected. *Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 545 (4th Cir. 2003) (citing *Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch)*, 258 F.3d 315, 320 (4th Cir. 2001)).   Congress has provided that government-guaranteed student loans are nondischargeable in bankruptcy unless the debtor can demonstrate that the repayment of such student loans would constitute an "undue hardship." 11 U.S.C. § 523(a)(8) (2005).[7] This exception from discharge of student loans "was enacted to prevent indebted students or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *In re Kielisch*, 258 F.3d at 320 (quoting *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998)).  Section 523(a)(8) of the Bankruptcy Code provides:

---

[7] The citations in this Memorandum Opinion to Title 11 of the United States Code are to those sections in effect at the time of the trial, not to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which will take effect on October 17, 2005.

A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C § 523(a)(8) (2005).

The term "undue hardship" is undefined in the Bankruptcy Code. The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). *In re Ekenasi*, 325 F.3d at 546.[8] Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *Id.* (quoting *Brunner*, 831 F.2d

---

[8] Prior to *In Re Ekenasi*, a number of courts within the Fourth Circuit Court of Appeals had utilized the *Brunner* factors to analyze whether the repayment of a student loan constituted an undue hardship under Section 523(a)(8) of the Bankruptcy Code. *See Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, No. 01-30624, 2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002); *see also Tennessee Student Assistance Corp. v. Mort (In re Mort)*, 272 B.R. 181, 183 (W.D. Va. 2002); *Vermont Student Assistance Corp. v. Coulson (In re Coulson)*, 253 B.R. 174, 177 (W.D.N.C. 2000); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C. 1995); *Virginia Educ. Assistance Auth. v. Dillon (In re Dillon)*, 189 B.R. 382, 384 (W.D. Va. 1995); *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack)*, No. 99-10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000); *Walcott v. USA Funds, Inc. (In re Walcott)*, 185 B.R. 721, 724 (Bankr. E.D.N.C. 1995).

at 396).

A determination of the dischargeability of a student loan must be brought by filing an adversary proceeding. *Banks v. Sallie Mae Servicing Corp. (In re Banks)*, 299 F.3d 296, 300 (4th Cir. 2002) (citing Fed. R. Bankr. P. 7001(6)). The debtor has the burden to prove by a preponderance of the evidence that repayment of the student loans would constitute an undue hardship. *U.S. Dep't of Educ. v. Blair (In re Blair)*, 301 B.R. 181, 184 (D. Md. 2003) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)); *Jones v. Nat'l Payment Ctr. (In re Jones)*, 242 B.R. 321, 325 (Bankr. E.D. Va. 1998), *aff'd in part and remanded on other grounds sub nom. Educ. Credit Mgmt. Corp. v. Jones*, No. 3:99CV258, 1999 WL 1211797 (E.D. Va. July 14, 1999).

Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule, and it must mean more than unpleasantness associated with repayment of a just debt. *In re Jones*, 242 B.R. at 325. Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a "certainty of hopelessness." *Id.* (quoting *Lezer v. New York State Higher Educ. Servs. Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr. N.D.N.Y. 1982)). In order to discharge a student loan, a debtor must show that unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor her obligations. *Id.* (citing *Love v. U.S. (In re Love)*, 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)).

1. Can the Debtors Maintain a Minimal Standard of Living?

The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the student loans. *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396). In making this assessment, a court should examine a debtor's standard of living with a view toward ascertaining whether the debtor has attempted to minimize the expenses of herself and her dependents. *U.S. Dep't of Health & Human Servs. v. Smitley (In re Smitley)*, 347 F.3d 109, 117 (4th Cir. 2003) (citing *In re Ekenasi*, 325 F.3d at 546; *Rice v. U.S. (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir. 1996)). In contemplation of what constitutes a "minimal standard of living," some courts have equated poverty with such a standard. *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack)*, No. 99-10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000) (citing *Griffin v. Eduserv (In re Griffin)*, 197 B.R. 144, 147 (Bankr. E.D. Okla. 1996)). Other courts have not required that debtors live in poverty in order to satisfy the first *Brunner* prong, instead taking into consideration the debtor's current income and expenses in determining whether the debtor and her dependents, if any, will be able to sustain a "minimal" standard of living. *Id.* (citing *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 907 (D.S.C. 1995), *aff'd* 85 F.3d 615 (4th Cir. 1996)). Specifically, the bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing, and medical treatment, are met. *Salinas v. United Student*

23

*Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr. W.D. Wis. 1999) (citing *In re Rice*, 78 F.3d at 1149). Once that determination is made, the question is whether the debtor has additional funds with which to make payments toward her student loans. *Id.*

Courts within the jurisdiction of the Fourth Circuit Court of Appeals have held that family income must be the measure of the income calculation commanded by the first *Brunner* prong. *Educ. Credit Mgmt. Corp. v. Buchanan (In re Buchanan)*, 276 B.R. 744, 751 (N.D. W.Va. 2002) (citing *Virginia State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382, 385 (W.D. Va. 1995); *White v. U.S. Dep't of Educ. (In re White)*, 243 B.R. 498, 509 (Bankr. N.D. Ala. 1999)). "In fact, the vast majority of reported decisions in which the dischargeability of a student loan debt owed by a married debtor was at issue the courts have considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of the debtor's lifestyle."[9] *In re White*, 243 B.R. at 509; *see also Sweeney v. Educ. Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362-63 (D. Neb. 2002) ("Overwhelming authority requires that a court consider the spouse's income. This court finds no published opinion of a court that holds to the contrary.").

The reasoning for inclusion of a non-debtor spouse's income in measuring the lifestyle of the debtor spouse was aptly explained by Judge Cohen:

> Couples not only provide financial support to one another, but each partner has a legal obligation, enforceable between them, to support one another to the extent of the individual capabilities. . . .

---

[9] See *In re White*, 243 B.R. at 509, for an exhaustive list of some forty-nine supporting decisions.

> In the bankruptcy context, section 523, by its terms, plainly considers the impact of the exception of a student loan debt from discharge on both the debtor *and his or her dependents*. A family member can be a dependent of, or a provider for, the debtor. Either way, the family member's very existence impacts the quality of the debtor's lifestyle, maybe adversely, maybe favorably.

*In re White*, 243 B.R. at 510 (footnotes omitted).

Additionally, consideration of a non-debtor spouse's income is common in a number of other bankruptcy contexts, including a determination under 11 U.S.C. § 523(a)(15) of whether the benefit to a debtor of discharging a non-support obligation arising from a divorce outweighs the detriment such a discharge would have on the debtor's former spouse, (*Ferraro v. Ballard* (*In re Ballard*), No. 00-71225, 2001 WL 1946239, at *19 (Bankr. E.D. Va. July 18, 2001), *aff'd* 69 Fed. Appx. 145 (4th Cir. 2003) (per curiam) (unpublished)), and in a determination of whether or not a debtor is devoting all of his or her disposable income to the fulfillment of a Chapter 13 plan as required by 11 U.S.C. § 1325(b)(1)(B) (*In re White*, 243 B.R. at 511 (citing numerous cases)).

Finally, some debtors have argued that even if a non-debtor's income is considered in the context of the initial *Brunner* prong, it should be considered only to the extent of the non-debtor spouse's agreed share of the combined family living expenses. If not so considered, the argument continues, the non-debtor spouse will, in effect, be forced to help pay the debtor's student loans by being required to pay more than his or her fair share of the living expenses, while that portion of the debtor's income which ordinarily would be devoted

25

to the payment of his or her share of the living expenses is diverted to the student loan

creditors. Here again, the command of *Brunner* to measure the debtor's actual lifestyle

nullifies this argument. This Court's measure of a "minimal" lifestyle, therefore, makes

irrelevant any theoretical calculation of a debtor's "fair share" of their family lifestyle. *In

re White*, 243 B.R. at 512. Thus, this Court must review the actual lifestyle and living

standard of the debtors to fairly conclude whether the first prong of *Brunner* has been proven.

A review of decisions of the jurisdictions of the Fourth Circuit indicates that courts

generally do not find an inability to maintain a minimal standard of living where a debtor

shows a surplus of income over expenses. *Virginia State Educ. Assistance Auth. v. Dillon*,

189 B.R. 382, 385 (W.D. Va. 1995) (where debtor testified that she could pay $50-$75 each

month on $2,000.00 student loan, there was no undue hardship); *Love v. U.S. (In re Love)*,

33 B.R. 753, 754 (Bankr. E.D. Va. 1983) (no undue hardship where debtor had $30.00 per

month surplus of income over expenses to repay $9,000.00 student loan); *Virginia Educ.

Loan Auth. v. Archie (In re Archie)*, 7 B.R. 715, 718-19 (Bankr. E.D. Va. 1980) (evidence

showed a net surplus of $37.13 of income over expenditures even with extraordinarily high

telephone bill and clothing expenses to repay approximately $2,000.00 student loan).

In contrast, many of the decisions of the jurisdictions of the Fourth Circuit have

permitted a discharge of student loans where there was a substantial deficiency of income to

expenses for a debtor. *See, e.g., Vermont Student Assistance Corp. v. Coulson (In re

Coulson)*, 253 B.R. 174, 178 (W.D.N.C. 2000) (first *Brunner* prong met where "debtor's

expenses clearly exceed her income, even though debtor has done almost everything possible

to maximize her income and minimize her expenses"); *Ammirati v. Nellie Mae, Inc.* (*In re*

*Ammirati*), 187 B.R. 902, 907 (D.S.C. 1995) (no error where bankruptcy court "found the

debtor's current income is $3,800.00 [monthly] with expenses of $4,350.00 and that, with

the exception of selling his house, debtor had done everything possible to minimize expenses

and maximize income"); *Wilson v. Educ. Credit Mgmt. Corp.* (*In re Wilson*), No. 01-30624,

2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002) (discharge permitted where

debtor had monthly expenses of $1,829.03 and income of $1,578.99); *McCormack v. Educ.*

*Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637, 2000 WL 33710278, at *5 (Bankr.

D.S.C. July 3, 2000) (partial discharge permitted where debtor's monthly expenses were

$2,446.48 and income was $2,078.00); *Reilly v. United Student Aid Funds, Inc.*, 118 B.R. 38,

41 (Bankr. D. Md. 1990) (discharge permitted where $600.00 per month deficiency of

income to expenses).  While it is certain that a proper analysis of whether the debtor may

maintain a minimal standard of living and repay a student loan entails many considerations

other than the existence or not of a deficiency of monthly income to expenses, nonetheless

these decisions provide insight into the living circumstances which compel a court to find

satisfaction or not of the initial *Brunner* prong.

A review of the evidence in the instant matter shows that Mrs. Gill has failed to carry

her burden of proving that she will be unable to maintain a minimal standard of living if

required to repay the remaining Loan balance.

27

When the debtors filed their Chapter 7 petition on August 16, 2004, Schedule I of the bankruptcy schedules listed a combined monthly income of $3,402.63. At the time of filing, Mrs. Gill was employed at ValueOptions and had a monthly net income of $2,066.63. However, shortly after filing bankruptcy, Mrs. Gill lost her job at ValueOptions due to a reduction in force. Pl. Ex. 6. Mrs. Gill testified that she and Mr. Gill currently have a combined monthly income between $2,472.00 and $2,772.00, dependent upon how many hours she works each week in her private practice at Dominion Psychiatric. A closer review of the evidence concerning Mrs. Gill's employment, however, reveals a slightly higher monthly income for Mrs. Gill, which obviously impacts her monthly family income. Mrs. Gill testified that she works between thirteen and fifteen hours per week at Sentara. According to the pay stub from that job (admitted as Defendant's Exhibit C), Mrs. Gill earns hourly wage of $23.63. Thus, a simple calculation reveals that Mrs. Gill earns monthly gross income from Sentara between $1,228.76 (four weeks at 13 hours per week) and $1,417.80 (four weeks at 15 hours per week).

Similarly, Mrs. Gill testified that she works between one and five hours on Saturday at her private practice and that she earns between $100 and $400 per month at Dominion Psychiatric. Were Mrs. Gill to work one hour per week at Dominion Psychiatric (at her hourly rate of $27.00), her monthly gross income from that job would be $108.00 per month from Dominion Psychiatric; working five hours per week would yield a monthly gross income of $540.00 from that job. To be sure, the number of hours Mrs. Gill works at

28

Dominion Psychiatric is dependent upon the number of clients that she has at any given time, and thus, the number of hours Mrs. Gill works at that job is somewhat beyond her control. Nonetheless, combining the calculations of Mrs. Gill's income from her two jobs reveals a total possible monthly gross income ranging between $1,336.76 and $1,957.80.

Mrs. Gill's pay stub from Sentara reveals that approximately twelve percent of her wages are withheld for Federal and state taxes, Medicare, and Social Security tax. A pay stub from Dominion Psychiatric was not submitted by either party, and no testimony was given as to the amount of taxes withheld from that check. On the subject of taxes, Mrs. Gill testified that she recently paid $400.00 in Federal income tax because an insufficient amount was withheld from her weekly pay. The Court concludes that by withholding an additional $8.00 per week ($400.00 divided by 52 weeks) from her pay check for Federal income tax, Mrs. Gill could have owed little to no additional money to the Internal Revenue Service. Utilizing these calculations, the Court finds that approximately fourteen percent of Mrs. Gill's income is necessarily devoted to taxes and required withholdings. Thus, to determine Mrs. Gill's monthly *net* income, one must deduct approximately fourteen percent from her gross income. As a result, the Court calculates a monthly *net* income for Mrs. Gill between $1,149.76 and $1,683.80.

As to Mr. Gill's income, it appears to the Court that his monthly Social Security Disability income of $1,372.00 represents the maximum income he can attain given his health condition. Mr. Gill's condition is clearly the result of his accident. The Court finds

Mr. Gill's testimony credible that he has sought employment in the teaching field, in which

he has over twenty-four years of experience, but has been unable to secure such employment.

The Court also finds credible Mr. Gill's statements that he has inquired as to compensation

for his volunteer services at the Contemporary Arts Center. Finally, Mr. Gill's state of health

convinces the Court that his employment prospects are limited, too, by the level of fatigue

he suffers following his short periods of volunteer work. Therefore, the Court finds that the

debtors have a total combined monthly income between $2,521.76 and $3,055.80. Thus,

while the lesser of these two amounts is within the range cited by Mrs. Gill, the upper bounds

of the debtors' potential combined monthly income is approximately $300.00 higher.

Also necessary to the inquiry of whether Mrs. Gill has attempted to maximize her

income is the fact that Mrs. Gill admittedly works a maximum of twenty hours per week total

between her two jobs. To her credit, Mrs. Gill has continued her private practice at

Dominion Psychiatric, which increases her monthly income by approximately $100.00 to

$500.00 per month. The reasoning for her limited work schedule is threefold according to

her. Mrs. Gill states that she was hired at Sentara to work only a limited number of hours;

likewise, her hours at Dominion Psychiatric are based upon the number of clients she has at

any given time. Mrs. Gill also works a reduced schedule, she argues, due to the need to care

for her husband, particularly on days when his home health aid does not arrive; however, she

also testified that Mr. Gill does not require full-time care. The latter is evidenced by the fact

that Mr. Gill is able to transport himself via his wheelchair to a volunteer position in his

neighborhood approximately two days per week for two hours per day. Finally, coupled with

the latter reason is Mrs. Gill's desire that Mr. Gill retain his Medicaid benefits, which would

either be reduced or terminated if their household income exceeds a certain amount (though

she was unable to state what that amount would be).

Such circumstances are somewhat, though not wholly, similar to those that this Court

examined recently in *Murphy v. Sallie Mae (In re Murphy)*, 305 B.R. 780 (2004). In that

case, the debtor seeking discharge of her student loans asserted that she was forced to

discontinue medical school and was unable to work because her child suffered a serious

illness since birth and required full-time care. *Id*. at 784. The debtor's child was eligible for

and received a reimbursement from Medicaid for in-home nursing care for sixteen hours per

day. Despite the provided nursing care, Murphy argued that "she must be available in the

event a nurse is ill, unavailable or does not appear to give [her child] necessary care and that

the nurses are not [able to] legally transport [her child], therefore requiring the debtor's legal

presence at all times."[10] In addition, Murphy argued that the nursing care was scheduled two

to four weeks in advance, which also hampered her ability to work. *Id*. at 787. The Court

observed that the Murphys "have concluded their needs and the needs of their children are

best met by electing to have Murphy supply the bulk of the childcare while Mr. Murphy is

employed outside the home." *Id*. at 795 fn.18.

---

[10] No out-of-pocket expenses relating to the Medicaid-provided health care were
scheduled by Murphy, and thus, the Court found that the care was provided to Murphy's child
without expense to Murphy or her husband, who was the sole provider for the household. *In re
Murphy*, 305 B.R. at 787 fn.9.

In the instant matter, it appears that Mrs. Gill is faced with a Hobbesian choice of sorts. Mrs. Gill testified that, at her current income level, she is not liable for any reimbursement to Medicaid toward any of Mr. Gill's medical care. However, her income is reevaluated quarterly for the purpose of determining the amount of her reimbursement to Medicaid, if any. Mrs. Gill testified that her expected reimbursement when she worked at ValueOptions, and earned a monthly net income of $2,066.63, was approximately $850.00 (though the pertinent exhibit showed an expected contribution of $827.00). Pl. Ex. 6; *see also* fn.6, *supra*. Mrs. Gill argued that, even if her income increased, she would be required to use those funds to reimburse Medicaid on Mr. Gill's behalf, and thus, she would be in essentially the same financial position as she is in now.

There is insufficient evidence in the instant case upon which to base a determination of what level of income would enable Mrs. Gill to meet not only any reimbursement requirement to Medicaid, but also to repay the Loan and maintain a minimal standard of living for herself and Mr. Gill. However, the Court does find that, in these extraordinarily unique circumstances, there is sufficiently uncontradicted evidence that a significant increase in Mrs. Gill's income would not wholly inure to the benefit of this or any other creditor. Were Mrs. Gill's income increase to the level that it was when she worked for ValueOptions, this Court concludes that Mrs. Gill's expected contribution toward her husband's medical care would likewise increase. Whether the increase in income would completely offset the increase in the expected contribution to Medicare is not an issue for this Court to decide; it

32

is enough to say, however, that Mrs. Gill's expected reimbursement to Medicaid does increase in some ratio unknown to the Court when her income increases.[11]

To complete the analysis under the first prong of *Brunner*, the Court must now examine the expenses of the debtors. The debtors' Schedule J lists total monthly expenses of $3,349.00. Pl. Ex. 4. Mrs. Gill testified, however, that, while many of their monthly expenses remain approximately the same, they have strived to reduce several other expenses. Mrs. Gill testified that the rent, electricity, water and sewer expenses, and home maintenance costs have remained constant. Also remaining steady were their expenses for groceries, clothing, life insurance, and car insurance. According to Mrs. Gill, her transportation expense has increased due to the rising cost of gasoline. The debtors have, according to Mrs. Gill, reduced their recreation expense, The debtors' medical and dental expenses have also decreased. Mrs. Gill did not provide the Court with specific amounts regarding the changes in these expenses.

The expenses the debtors have sought to reduce include their cellular phone expense, which they have reduced by $20.00 per month from a previous expense of $200.00. In addition, the debtors receive a monthly contribution of $35.00 from Mrs. Gill's emancipated daughter to offset the cost of her cell phone. However, this savings must be viewed in light of an increase in the cost of a combined landline telephone, internet service, and cable

---

[11] Apparently the Medicaid assistance paid to Mr. Gill without the current necessity of any reimbursement requirement is founded upon the actual (as opposed to potential or imputed) family income of the debtors, as, given her education and professional experience, Mrs. Gill appears to be capable of earning substantially more than she currently does.

package, the cost of which is approximately $117.00 per month. The debtors' previous

combined cost for cable and internet service was $71.00. Currently, despite a $55.00

monthly reduction regarding the cell phone (including the daughter's contribution), the total

reduction in monthly expenses for these four items is only approximately $9.00.

Mrs. Gill testified as to additional expenses she recently incurred but that were not

listed on her bankruptcy schedules. These expenses included $400.00 to the Internal

Revenue Service for 2004 Federal taxes and $67.00 for personal property taxes.

Mrs. Gill also gave testimony regarding payment of her daughter's health insurance.

Mrs. Gill stated that she pays this expense for her daughter because her daughter has diabetes

and needs insurance to pay for related costs. At the time of trial, the monthly health

insurance premium for her daughter was $250.00. Mrs. Gill testified that she has no health

insurance for herself.

The evidence is undisputed that Mrs. Gill's daughter is twenty-four years old and is

employed, albeit in a minimum wage job, despite the fact that she completed approximately

two and one-half years of college course work. No evidence was adduced at trial of any

physical or mental impediments of Mrs. Gill's daughter that impedes her employment. It is

also undisputed that Mrs. Gill's daughter resides with her and Mr. Gill but there is no

evidence of any contribution by her toward the household expenses, save $35.00 per month

toward her cell phone.

Several courts within the jurisdiction of the Fourth Circuit have addressed the issue

of supporting emancipated adults when a debtor is seeking a discharge of student loan debt

under Section 523(a)(8). The conclusions of these courts, that debtors should not be

permitted to support emancipated children and other independent adults, are based upon the

overriding principle that "[a] debtor seeking to discharge her education loans under §

523(a)(8) is . . . not permitted to support emancipated children or other independent family

members at the expense of her creditors." *Perkins v. Pennsylvania Higher Educ. Assistance

Agency (In re Perkins)*, 318 B.R. 300, 306 (Bankr. M.D.N.C. 2004) (citing *Educ. Credit

Mgmt. Corp. v. Buchanan (In re Buchanan)*, 276 B.R. 744, 752 (N.D. W.Va. 2002)). As

aptly stated by these courts, "If given the choice between giving money to their creditors or

their legally independent children, undoubtably most debtors would choose their children.

Were this allowed, few debtors would be adjudged capable of repaying their debts." *In re

Buchanan*, 276 B.R. at 752.

Most recently, a court found that providing $200.00 per month in support to two

emancipated stepchildren, whom the debtor had no legal obligation to support, while not

frivolous, was at the very least unnecessary. *Educ. Credit Mgmt. Corp. v. Gouge*, 320 B.R.

582, 586 (W.D.N.C. 2005). Likewise, a debtor may not continue to support even their own

biological children after they reach the age of 18 to the detriment of his creditors. *In re

Buchanan*, 276 B.R. at 752. Another court recently found that a monthly payment of $125.00

for the care of a debtor's mother, who lived in a nursing home, should be eliminated from

the debtor's budget, as there was no evidence that the mother lacked financial resources, and

35

such expense was not properly treated as part of the debtor's minimal living expenses. *In re Perkins*, 318 B.R. at 308. Similarly, yet another court has found that, where at least $200.00 of a debtor's monthly expenses resulted from the debtor's support of her two adult daughters, both of whom continued to live with their mother but did not pay any of their own expenses, the daughters were "adults who are responsible for supporting themselves and are not 'dependents' . . . for the purposes of § 523(a)(8)." The court went on to state that even if support of the adult children could be considered a necessary expense, the expense "surely will end in the relatively near future when the adult children have had a reasonable opportunity to complete their education." *Matthess v. U.S. Dep't of Educ. (In re Matthess)*, No. 98-12955C-7G, 2000 WL 33673763, at *4 (Bankr. M.D.N.C. Feb. 4, 2000); *see also U.S. Dep't of Health & Human Servs. v. Smitley*, 347 F.3d 109, 124 (4th Cir. 2003) (in declining to discharge HEAL loan due to unconscionability, "as his children reach 18 (and possibly even before), Smitley could at least reduce his monthly shelter and transportation expenses (or request contributions toward housing and food from his children after they reach majority)").

Courts outside the jurisdiction of the Fourth Circuit Court of Appeals have applied this principle as well. For example, one court, faced with debtors who, similar to the instant case, were paying for their twenty-seven-year old son's monthly health care cost of $106.58, found there was "no support for the notion that a minimal standard of living under the first prong of the *Brunner* test should include voluntary assumption of non-dependent family

members' expenses without a legal obligation to do so." *Williams v. Educ. Credit Mgmt. Corp. (In re Williams)*, 301 B.R. 62, 73 (Bankr. N.D. Cal. 2003). The court found that to permit debtors to pay such expenses would be akin to sanctioning the debtors' "self-imposed hardship." *Id.* at 73 and fn.7 (citing *Archibald v. United Student Aid Funds (In re Archibald)*, 280 B.R. 222 (Bankr. S.D. Ind. 2002); *Coveney v. Costep Servicing Agent (In re Coveney)*, 192 B.R. 140 (Bankr. W.D. Tex. 1996); *Stebbins-Hopf v. Texas Guar. Student Loan Corp. (In re Stebbins-Hopf)*, 176 B.R. 784 (Bankr. W.D. Tex. 1994); *Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744 (Bankr. N.D. Ill. 1988)). In so finding, the *Williams* court deducted the monthly health care expense from the debtors' budget, effectively reducing their monthly expenses. *Id.* at 73.

Along these lines, the court in *Coveney v. Costep Servicing Agent (In re Coveney)*, 192 B.R. 140 (Bankr. W.D. Tex. 1996), held that a debtor, who moved in with her mother to provide physical care for her, was ultimately responsible for her own financial hardship because she had failed to look for any meaningful, permanent employment for a period of at least two years. The court "recognize[d] the Debtor's unselfish efforts to care for her mother, but finds that her moral obligation to a family member, who is not a dependent, does not take priority over her legal obligation to repay her educational loans."[12] *Id.* at 144 (citing

---

[12] The court in *In re Coveney* considered the fact that the debtor was caring her mother under the analysis of the third prong of *Brunner*, which examines whether the debtor has acted in good faith. However, such an inquiry is also appropriate in the instant matter in the analysis of the first prong of *Brunner*, as the fact that Mrs. Gill pays certain of her daughter's expenses has an obvious impact on the debtors' expenses and consequently upon whether a minimal standard of living can be maintained.

*In re Stebbins-Hopf*, 176 B.R. at 788); *see also Hall v. U.S. Dep't of Educ. Nat'l Payment Ctr. (In re Hall)*, 277 B.R. 882, 888 (Bankr. S.D. Ohio. 2002) (reaching a similar conclusion as to the debtor caring for his godson, who was not the debtor's legal dependent). However, at least one court has concluded that a Chapter 13 debtor's contribution of support of her elderly mother, an expense that the debtor shared with another sibling, is a reasonable expense under the undue hardship inquiry of Section 523(a)(8). *See Sequiera v. Sallie Mae Servicing Corp. (In re Sequeira)*, 278 B.R. 861, 866-67 (Bankr. D. Or. 2001) (so holding upon a finding that debtor's mother was a dependent, as she "reasonably relie[d] on the debtor for support and whom the debtor ha[d] reason to and does support financially").

To be sure, the discussion concerning support of emancipated, independent adults is incomplete without a discussion of who is considered to be a dependent. The Bankruptcy Code does not define the term "dependent" or provide any guidance in determining who is a dependent, particularly for purposes of Section 523(a)(8). *Doe v. Educ. Credit Mgmt. Corp. (In re Doe)*, No. 02-42736, 2005 WL 1240197, at *5 (Bankr. S.D.N.Y. Mar. 31, 2005). Those courts that have addressed the definition of "dependent" have usually done so in the context of other provisions of the Bankruptcy Code. For example, in considering the term "dependent" regarding a Chapter 7 debtor's income and expenses for the purpose of determining whether the debtor was engaging in substantial abuse, one court found, similar to the court in *In re Sequiera*, that "dependent" means "a person who reasonably relies on the debtor for support and whom the debtor has reason to and does support financially." *Leslie*

38

*Womack Real Estate v. Dunbar (In re Dunbar)*, 99 B.R. 320, 324 (Bankr. M.D. La. 1989).

Other courts have drawn upon the definition of dependent as set forth in the Internal
Revenue Code, at least to the extent that the dependent at issue is a child of the debtor as
opposed to another, independent adult. While finding that a determination of whether the
child in that case was a dependent was not a necessary conclusion to reach, one court stated
that under the income contingent repayment plan, the definition of dependent utilized is that
which is found in the Internal Revenue Code, which indicates that an unmarried student child
may be classified, subject to some exceptions, as a dependent for taxation purposes until they
reach the age of twenty-four. *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R.
216, 228-29 (Bankr. N.D. Ohio 2005) (citing 26 U.S.C. § 152(c)(3)).

The court in *In re Doe* took the analysis one step further, finding that a court has no
basis on which to exclude expenses of those individuals who meet the legal definition of
"dependent" under the Internal Revenue Code when analyzing a case under Section
523(a)(8). That court set forth five "tests" for a dependent utilized by the Internal Revenue
Service that must all be satisfied for an individual to be considered a dependent: (1) Member
of Household or Relationship Test; (2) Citizen or Resident Test; (3) Joint Return Test; (4)
Gross Income Test; and (5) Support Test. *In re Doe*, 2005 WL 1240197, at *5. In that case,
the court found that the debtor's mother qualified as a dependent under the IRS standard
because she lived with the debtor for at least part of the calendar year; was a United States
citizen; did not file her own tax return and had no income; and received more than half of her

39

putative support from the debtor. *Id.* at *6.

This Court finds that the better reasoned view of support of emancipated children and independent adults by debtors seeking discharge of student loans is the one subscribed to by other courts within the Fourth Circuit, specifically, that creditors should not be placed behind emancipated children and independent adults in the line for payment from a debtor. Even if this Court were to apply the definition of "dependent" suggested by the *Grove* and *Doe* courts, Mrs. Gill would have failed to meet her burden of proving that her twenty-four-year old daughter should be considered a dependent under that standard. Therefore, upon consideration of the evidence, the Court concludes that Mrs. Gill's payment of her daughter's health insurance, while not frivolous, is not an expense that is necessary to maintain a minimal standard of living for herself and her husband and cannot be considered by this Court in determining whether Mrs. Gill would suffer undue hardship if forced to repay the Loan.    While Mrs. Gill's intentions are certainly noble and her action of paying her daughter's health insurance premiums is one in which many parents would engage if their child was faced with similar health issues, this point is belied by the fact that Mrs. Gill's daughter is, for all legal purposes, an emancipated adult. There is certainly no evidence before this Court to suggest that Mrs. Gill's daughter is incapable, either mentally or physically, of supporting herself. *See, e.g., Lieberman v. Educ. Credit Mgmt. Corp. (In re Lieberman)*, No. 00-50978, 2004 WL 555245, at *4-5 (Bankr. D. Minn. Mar. 4, 2004) (finding that the financial consequences of continued care for a seriously disabled adult child

40

are properly considered in the analysis of undue hardship). Thus, the Court cannot allow

Mrs. Gill to continue to pay her daughter's health insurance premiums at her creditors'

expense. Therefore, the Court will deduct that expense in calculating the debtors' monthly

expenses.

CSLP has argued, as to Mrs. Gill's payment of her daughter's health insurance, that

the $250.00 premium is greater than the monthly payment amount that was due for repayment

of the Loan, and that by simply not paying the health insurance premium, Mrs. Gill should

have sufficient excess income to pay the Loan payment. While this argument is facially

appealing, the Court would be in dereliction of its duties to simply examine one expense, rule

that it was an unnecessary one, and find that the resulting surplus should be used to pay the

debt to one creditor. Instead, *Brunner* commands a more comprehensive examination of the

facts and a three-pronged analysis to determine whether these debtors would suffer an undue

hardship if Mrs. Gill had to repay the Loan in question. Thus, the analysis under *Brunner*

must continue.

In light of the above findings, as well as Mrs. Gill's testimony, the Court concludes

that the debtors' current monthly expenses are more accurately assessed at $2,741.00, instead

of the $3,349.00 amount set forth on the debtors' Schedule J. The expenses that the debtors

are currently incurring, and that the Court finds are necessary to maintain a minimal standard

of living, are set forth as follows:

41

|  | Rent or home mortgage payment | $1,000.00 |
| Utilities: | Electricity and heating fuel | $ 200.00 |
|  | Water and sewer | $ 40.00 |
|  | Telephone (cellular) | $ 145.00 |
|  | Other: Cable, Internet, Landline Telephone | $ 117.00 |
|  | Home maintenance (repairs and upkeep) | $ 50.00 |
|  | Food | $ 500.00 |
|  | Clothing | $ 100.00 |
|  | Laundry and dry cleaning | $ 0 |
|  | Medical and dental expenses | $ 300.00 |
|  | Transportation (not including car payments) | $ 125.00 |
|  | Recreation, clubs, entertainment, newspapers | $ 50.00 |
|  | Charitable contributions | $ 0 |

Insurance (not deducted from wages or included in mortgage payments)

|  | Homeowner's or renter's | $ 0 |
|  | Life | $ 8 |
|  | Health | $ 0 |
|  | Auto | $ 100.00 |
|  | Taxes (Personal Property) | $ 6 |
|  | Installment Payments | $ 0 |
|  | Alimony, maintenance, and support to others | $ 0 |
|  | Payments of support for additional dependents not living at your home | $ 0 |
|  | Regular expenses from operation of business, profession or farm | $ 0 |

Thus, the Court's findings result in a deduction of $685.00 from the debtors' expenses, itemized as follows: (1) $55.00 for a lower cell phone expense (including Mrs. Gill's daughter's monthly contribution of $35.00); (2) $200.00 for the lower medical and dental expenses that Mrs. Gill testified the debtors currently incur; (3) $50.00 for lower

recreation expenses;[13] (4) $380.00 for lower health insurance costs (including the health

insurance premium for Mrs. Gill's daughter), in light of her testimony that she has no health

insurance for herself.[14]  The Court finds that the debtors are incurring, however, slightly

higher expenses for transportation and has factored in an additional $25.00 per month for

transportation costs.  The Court also adds an additional $46.00 per month for the cost of

adding a landline telephone.  Finally, the Court will add $6.00 per month to cover the yearly

personal property taxes, which the debtors did not include in their Schedule J, but which Mrs.

Gill testified she recently paid for the year in the amount of $67.00.  Thus, the Court finds

that the total of these increased expenses equals $77.00 per month, for a net reduction in

expenses of $608.00.

The Court's finding is also made in light of the fact that the debtors do not appear to

indulge in luxury items or live what the Court would perceive as a frivolous lifestyle.  One

can speculate that CSLP would argue (though it did not actually make such an argument

---

[13]  The reduction in the medical and dental expenses and the recreation expense are
estimates by the Court, given Mrs. Gill's vague testimony that these expenses had decreased but
gave no amount.

[14]  It is axiomatic that the Gills' budget does not include funds for health insurance or to
replace their aging automobile.  However, this Court has no evidence upon which to base any
reasonable allocation of funds toward these potential expenses.  To undertake any such
imputation would be purely speculative.  *See Smith v. Educ. Credit Mgmt. Corp.* (*In re Smith*),
___ B.R. ___, No. 05-005, 2005 WL 1322991, at *5 (1st Cir. B.A.P. June 6, 2005) (finding that
"[t]he bankruptcy court erred in identifying and quantifying future expenses [including medical
and dental expenses; health insurance; life insurance; and money to replace their aging motor
vehicles] without any supporting evidence in the record" and consequently erred in its imputation
of future expenses); *Rose v. Educ. Credit Mgmt. Corp.* (*In re Rose*), 324 B.R. 709, No. 04-6065,
2005 WL 1269315 (8th Cir. B.A.P. June 6, 2005) (finding that the debtor offered no evidence as
to future factors that could change her income, such as the need to purchase a vehicle, and thus,
the court could only speculate as to what those changes might be).

here) that there are numerous entries within the bank records for purchases at restaurants, video rental stores, and craft stores and that these are all unnecessary expenditures. *See generally* Def. Ex. I. However, as alluded to above, it is impossible for this Court to discern sufficient information from the bank statements as to expenditures such as these. Mrs. Gill's daughter apparently has access to the account, and there is no evidence that any money that Miss Holcombe withdrew from the account was limited to the amounts (if any) that she deposited. In addition, there was no testimony elicited by CSLP to confirm or deny the nature of the expenditures listed in the bank account records or who made them, save that information that can be gleaned from a review of a handful of the cancelled checks included with the records. Therefore, the Court will give little weight to the bank account records submitted into evidence.

The Court must now determine whether the debtors will be able to maintain a minimal standard of living if required to repay the remaining balance on the Loan. As the Court has found, the debtors' monthly expenses are more accurately assessed at $2,741.00. The Court has also determined that the debtors' monthly income ranges between $2,521.76 and $3,055.80, dependent upon the number of hours she works at her private counseling practice. The Court finds that its base calculation of the debtors' monthly income, given its slightly unpredictable nature, should be computed by averaging the upper and lower bounds of the debtors' income range. Thus, the Court concludes that the average monthly income for the debtor is $2,788.78.

Using the debtors' average income, the debtors have a monthly surplus of income over expenses of at least $50.00 and possibly substantially more, as outlined below. Courts in the Fourth Circuit, as outlined above, have generally not found an inability to maintain a minimal standard of living where the debtor has had even a surplus as small as $30.00 per month, and this Court makes the same finding in the instant case.[15]

The Court's examination of whether the debtors' expenses are reasonable in light of their financial situation reveals that a majority of the expenses appear to be acceptable. However, the Court is somewhat troubled by the monthly food expense of $500.00, which Mrs. Gill testified was the expense for only her and Mr. Gill and did not include any food expense for her daughter. Despite Mrs. Gill's explanation that the debtors' eat primarily organic foods, this Court finds that an expenditure of $500.00 is higher than this Court normally permits. While this Court certainly does not seek to dictate the specific grocery choices of the debtors, the Court would, however, caution the debtors that such expense is not favorably viewed, particularly when to do so is at the expense of creditors. Therefore, in addition to at least $50.00 per month that the Court has concluded constitutes the surplus in the debtors' budget, the Court further finds that the debtors' budget is not without further opportunity for minimization, particularly in the area of grocery expense. Unlike certain other expenses noted above, of which the Court attempted to make a reasonable estimate

---

[15] The Court is not unmindful of the fact that the debtors' surplus of income over expenses must also be considered in light of its ratio to the amount of student loan indebtedness owed, which the Court endeavors to so do in Part B. hereof, *infra*, in its consideration of whether a partial discharge is appropriate in this matter.

based upon Mrs. Gill's testimony, the Court will not fashion such an estimation in the instance of a consumable product such as food.

However, the Court is also mindful of the fact that Mrs. Gill's monthly net income totals approximately $1,683.80 during months in which she works closer to the maximum number of hours at each of her jobs. Thus, during those months, when combined with Mr. Gill's monthly Social Security Disability income of $1,372.00, the debtors' have a monthly net income which the Court has calculated to be $3,055.80. Taken in light of the Court's findings as to the debtors' expenses, calculated at $2,741.00, the Court finds that the debtors' monthly surplus of income would be approximately $314.80 those months. It should be noted, as well, that even a slight increase in the number of hours that Mrs. Gill works (which may or may not have an effect on her expected contribution to her husband's medical care, depending upon the formula used by Medicare, to which the Court is not privy) could have a significant effect on the amount of the debtors' monthly income surplus, given that Mrs. Gill's hourly wage rates are $23.63 at Sentara and $27.00 at Dominion Psychiatric, respectively. For example, were Mrs. Gill to work even one additional hour per week at each of her jobs, the debtors could have another $200.00 in surplus income per month. *See Smith v. Educ. Credit Mgmt. Corp. (In re Smith)*, ___ B.R. ___, No. 05-005, 2005 WL 1322991, at *4 (1st Cir. B.A.P. June 6, 2005) (finding that the bankruptcy court erred in calculating the wife-debtor's income at twenty-five hours per week instead of thirty hours per week, as the wife-debtor testified she could work, and concluding that a small, five-hour per week

adjustment in work hours could yield a post-tax income increase of approximately $250.00

per month). Further, that amount could increase depending upon additional adjustments to

the grocery expenditures and any future contributions from Mrs. Gill's daughter, as

previously alluded. Thus, with such a large potential surplus of income, Mrs. Gill has

clearly failed to meet her burden of proving an inability to maintain a minimal standard of

living and has thus, again, failed to meet the first *Brunner* prong.

Therefore, upon consideration of the evidence, the Court finds that Mrs. Gill has

failed to carry her burden of proving that she will be unable to maintain a minimal standard

of living if required to repay the remaining Loan balance. Having failed to meet her burden

of proof on the first *Brunner* prong, Mrs. Gill has failed to show that she will suffer undue

hardship if she has to repay the remainder of the Loan. Therefore, the Court finds that Mrs.

Gill is not entitled to a discharge of the Loan pursuant to 11 U.S.C. § 523(a)8). Nonetheless,

the Court will address the remaining two *Brunner* prongs.

> 2. Are There Additional Circumstances Indicating That the Debtors
> Will be Unable to Maintain a Minimal Standard of Living
> During a Significant Portion of the Loan Repayment Period?

The second *Brunner* prong requires a student loan debtor to establish that additional

circumstances indicate that a debtor's inability to maintain a minimal standard of living for

herself and her dependents if required to repay the student loans is likely to exist for a

significant portion of the repayment period of the student loans. *Ekenasi v. Educ. Res. Inst.*

*(In re Ekenasi)*, 325 F.3d 541, 546 (4th Cir. 2003) (citing *Brunner v. New York State Higher*

*Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)). Undue hardship is not based on a

present inability to pay but rather upon a "certainty of hopelessness that future payments

cannot be made." *Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, No. 01-30624, 2002

WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002) (citing *Love v. U.S. (In re Love)*, 33

B.R. 753, 755 (Bankr. E.D. Va. 1983)).

The second prong of *Brunner*, thus, can only be reached upon a finding by a court that

a debtor has an inability to pay his student loans while maintaining a minimal standard of

living. For the reasons set forth above, the Court has concluded that Mrs. Gill has failed to

establish that she is unable to pay the remaining Loan balance and maintain a minimal

standard of living. As this Court has recently stated, "[a]ccordingly, it is axiomatic that,

having failed the first *Brunner* prong, [the debtor] cannot satisfy the second prong." *Murphy*

*v. Sallie Mae (In re Murphy)*, 305 B.R. 780, 797 (2004) (citing *Reindl v. Educ. Credit Mgmt.*

*Corp. (In re Reindl)*, No. 02-C-0228, 2002 WL 32150420, at *3 (W.D. Wis. June 14, 2002)

("If, as I have found, the plaintiffs cannot show that they would be unable to maintain a

minimal standard of living if forced to pay their loans at this time, it is implausible that they

can meet this second factor [of *Brunner*].")). Thus, failing to demonstrate the inability to

repay the Loan and maintain a minimal standard of living, the Court must conclude that Mrs.

Gill has failed to establish the second prong of *Brunner*.

### 3. Has Mrs. Gill Demonstrated a Good Faith Effort to Repay?

The third prong of the *Brunner* test requires a court to measure whether a debtor has

made a good faith effort to repay the outstanding student loans. This final factor recognizes that "[w]ith the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir. 2002) (quoting *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)). This encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 928 (Bankr. N.D. Ohio 1995) (quoting *In re Roberson*, 999 F.2d at 1136).

   In determining whether a debtor has made a good faith effort to repay a student loan obligation, a primary consideration is whether the debtor actually made any payments on the obligation, and if so, the total amount of payments. *Hall v. U.S. Dep't of Educ. (In re Hall)*, 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002) (citing *Green v. Sallie Mae Servicing Corp. (In re Green)*, 238 B.R. 727, 736 (Bankr. N.D. Ohio 1999)). Some courts have concluded, however, that a debtor who fails to make payments on a student loan is not necessarily foreclosed from a finding of a good faith effort to repay, reasoning that good faith encompasses all relevant factors. *Id.* Where a debtor has made no payments on a student loan obligation, courts nonetheless have not precluded a finding of good faith where the debtor has no funds to make any repayments. *In re Elebrashy*, 189 B.R. at 928 (citing *Hawkins v. Buena Vista College (In re Hawkins)*, 187 B.R. 294, 299 (Bankr. N.D. Iowa

49

1995); *Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744, 749 n.18

(Bankr. N.D. Ill. 1989); *Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1011

(Bankr. N.D. Ind. 1987)).

One court has suggested a compendium of considerations in determining whether a

debtor has made a good faith effort to repay a student loan:

> (1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
>
> (2) whether the debtor has realistically used all their [sic] available financial resources to pay the debt;
>
> (3) whether the debtor is using their best efforts to maximize their [sic] financial potential;
>
> (4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;
>
> (5) the percentage of the student loan debt in relation to the debtor's total indebtedness;
>
> (6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.[16]

*In re Hall*, 293 B.R. at 737 (citing *Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847,

856 (Bankr. N.D. Ohio 2002)); *see also Cheesman v. Tennessee Student Assistance Corp. (In*

*re Cheesman)*, 25 F.3d 356, 360 (6th Cir. 1994) (relevant good faith factors are: (1) whether

the debtor attempts to repay the debt; (2) the length of time after the student loan becomes

---

[16] This Court disagrees that the tangible benefit a debtor obtained from a student loan obligation is properly a factor in the consideration of good faith. It is not appropriate for this Court to consider the "value" of a debtor's chosen education but rather only to assess whether the three prongs of *Brunner* have been satisfied. *See In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985); *Raymond v. Northwest Educ. Loan Assoc. (In re Raymond)*, 169 B.R. 67, 71 (Bankr. W.D. Wash. 1994) ("The government is not an insurer of the value of education."); *Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman)*, 144 B.R. 748, 752 (Bankr. N.D. Ohio 1992).

due that the debtor seeks to discharge the debt; (3) the percentage of the student loan debt in

relation to the debtor's total indebtedness; and (4) the debtor's attempts to find suitable

employment).

This Court has noted that a good faith effort also requires "the debtor to have made

payments when he or she was in a position to make such payments," and that "[c]ourts have

usually refused to discharge student loans where they are the bulk of debtor's debt or when

student debt is the first or second largest single type of debt." *Wilson v. Educ. Credit Mgmt.*

*Corp.* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *4 (Bankr. E.D. Va. June 25,

2002) (quoting *Lohr v. Sallie Mae* (*In re Lohr*), 252 B.R. 84, 89 (Bankr. E.D. Va. 2000)).

Some courts have additionally looked to whether a student loan debtor has attempted to

negotiate a repayment plan such as the federal government's Income Contingent Repayment

Plan as an important indicia of good faith.[17] *See Cota v. U.S. Dep't of Educ.* (*In re Cota*),

298 B.R. 408, 420 (Bankr. D. Ariz. 2003) ("The court agrees that the good faith requirement

---

[17] The United States Department of Education offers a number of repayment options for student loans. These plans are the standard repayment plan, extended repayment plan, graduated repayment plan, and income contingent repayment plan, each of which is offered under the William D. Ford Federal Direct Loan Program provided for under 34 C.F.R. § 685.208 (2005). Under the Income Contingent Repayment program, the annual amount payable by a borrower is the lesser of: (a) the amount the borrower would repay annually over 12 years; or (b) 20% of discretionary income. The Department of Education maintains an interactive website which permits borrowers to determine what their payments would be based on the outstanding amount due on a loan and based on the debtor's gross income and family size. The Department of Education also makes available on its website the "Direct Loan Payment Handbook," which provides worksheets which purportedly make it possible for a student loan obligor to determine what her payment would be under the four types of programs. *In re Cota*, 298 B.R. at 414 n.7, 420-21.

of *Brunner* requires that the court consider [the debtor's] conduct in failing to explore alternatives, such as the ICR. However, the failure to explore such programs, especially if the programs offer no effective relief, is not *per se* an indication of lack of good faith."); *see also Pennsylvania Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002) (quoting *U.S. Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D. Cal. 2000) ("Good faith is also measured by a debtor's effort—or lack thereof—to negotiate a repayment plan.")). Even after filing of an adversary to discharge a student loan, "[a] debtor's obligation to make 'good faith' efforts to repay [her] education loans is not extinguished," and where a debtor first learns about the Income Contingent Repayment programs during the trial of the adversary, a court considers whether any discussions concerning such options takes place. *In re Wallace*, 259 B.R. at 185. Finally, this Court is reminded that the William D. Ford Program is "no silver bullet," and if the creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them, failure to consider these alternatives does not indicate a lack of good faith. *In re Cota*, 298 B.R. at 421 (quoting *Cheney v. Educ. Credit Mgmt. Corp. (In re Cheney)*, 280 B.R. 648, 666 (N.D. Iowa 2002)).

A review of recent decisions of the courts of the Fourth Circuit reveals that in most instances where a court determined a debtor made a good faith effort to repay their student loan, there was a finding that substantial loan payments had been made. *See, e.g., Floyd v. Educ. Credit Mgmt. Corp.*, 54 Fed. Appx. 124, 126 (4th Cir. 2002) (unpublished) (where

bankruptcy court found the debtor kept in frequent contact with his lenders, arranged for

deferrals and forbearance, investigated loan consolidations and workout options, and made

partial payments for a year, third prong of *Brunner* was satisfied and no error committed);

*Vermont Student Assistance Corp. v. Coulson (In re Coulson)*, 253 B.R. 174, 179 (W.D.N.C.

2000) (good faith found "where debtor has diligently made payments or sought deferments

for seven years," notwithstanding "supporting at least 2 (and initially 4) dependent children

by herself"); *In re Wilson*, 2002 WL 32155401, at *4 (debtor consistently made payments on

student loans for twelve years and, after loan consolidation, made 29 payments); *McCormack*

*v. Educ. Credit Mgmt. Corp. (In re McCormack)*, No. 99-10637, 2000 WL 33710278, at *6

(Bankr. D.S.C. July 3, 2000) ("Debtor has made over twenty payments on her student loan

prior to filing bankruptcy, and she has made various efforts to find a job that would provide

more income, but has been unable to find one at the present time."); *In re Lohr*, 252 B.R. at

89 ("[T]he debtor made payments when she was financially able, tried to negotiate

deferments and forbearance in lieu of bankruptcy when she was not and filed bankruptcy

only as a last resort.").

Conversely, where no payments at all have been made by a debtor, courts often have

concluded a good faith effort to repay was not in evidence. *Tennessee Student Assistance*

*Corp. v. Mort (In re Mort)*, 272 B.R. 181, 185 (W.D. Va. 2002) ("Although her failure to

make payments on the loan does not on its own show lack of good faith, the debtor's refusal

to minimize her expenses and maximize her income . . . preclude a hardship discharge of any

portion of the loan."); *Weir v. Paige (In re Weir)*, 296 B.R. 710, 718 (Bankr. E.D. Va. 2002) (good faith not shown where "[n]ot only has debtor not made any effort to repay any portion of these loans, but she has repeatedly refused various repayment options that have been offered to her"); *Kapinos v. Graduate Loan Ctr. (In re Kapinos)*, 253 B.R. 709, 714 (Bankr. W.D. Va. 2000) (no "'good faith efforts to repay the loans' when [the debtor] has affirmatively established that she made no efforts to make any payments before seeking their discharge"). *But see Reilly v. United Student Aid Funds, Inc.*, 118 B.R. 38, 41 (Bankr. D. Md. 1990) ("[T]he debtor's demonstrated inability to tender payments on a student loan which became due five years prior to filing of bankruptcy provides an exception to the rule that payments must be made in order to show good faith.").

Decisions outside of the jurisdiction of the Fourth Circuit Court of Appeals mirror this same reluctance to find good faith where the debtor has made minimal or no payments on student loans. *See, e.g., Fuller v. U.S. Dep't of Educ. (In re Fuller)*, 296 B.R. 813, 818 (Bankr. N.D. Cal. 2003) (good faith not shown where debtor made no payments on his Department of Education loans); *Thomas v. Educ. Credit Mgmt. Corp. (In re Thomas)*, 257 B.R. 144, 150 (Bankr. S.D. N.Y. 2001) (good faith not shown where the "[d]ebtor only made seven payments totaling $683.69 from 1991 to 1993 and has made no payments at all since receiving her master's degree"); *Ledbetter v. U.S. Dep't of Educ. (In re Ledbetter)*, 254 B.R. 714, 717 (Bankr. S.D. Ohio 2000) (good faith not shown "when debtor made only three payments on two student loans that represented the only scheduled debt in [the] case");

*Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 656-

57 (Bankr. N.D. Ohio 1999) (good faith effort to repay not shown where debtor made no

payments on loans that represented 92% of her indebtedness); *Mitchell v. U.S. Dep't of Educ.*

*(In re Mitchell)*, 210 B.R. 105, 109 (Bankr. N.D. Ohio 1996) (good faith effort to repay not

shown when debtor only made $300.00 payment on $8,000.00 student loan debt that was

only scheduled debt in the case); *Cobb v. Univ. of Toledo (In re Cobb)*, 188 B.R. 22, 24

(Bankr. N.D. Ohio 1995) (good faith not shown where debtor made only two payments on

student loans representing over 50% of scheduled debt); *Garrett v. New Hampshire Higher*

*Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 364 (Bankr. D.N.H. 1995) (good faith

not shown where "[t]he record is devoid of any payment made by [the debtor] on these loans

or even any attempt to enter into a repayment schedule with [the lenders]"); *Daugherty v.*

*First Tennessee Bank (In re Daugherty)*, 175 B.R. 953, 958-60 (Bankr. E.D. Tenn. 1994)

(good faith effort to repay not shown when debtor made only two payments on student loans

amounting to 47% of total unsecured debt); *Raymond v. Northwest Educ. Loan Ass'n (In re*

*Raymond)*, 169 B.R. 67, 70 (Bankr. W.D. Wash. 1994) (good faith not shown where the

debtor made no payments on his student loans for at least half the time he was employed);

*Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman)*, 144 B.R. 748, 751

(Bankr. N.D. Ohio 1992) (good faith not shown where "[d]ebtor deferred the loan repayment

once, but made no payments or even contacted the creditor in an attempt to reschedule the

payments"). *But see Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 929

(Bankr. N.D. Ohio 1995) ("Given the magnitude of the student loan debt, the paucity of [the debtor's] income, and the apparent hopelessness for future improvement of his situation, the fact he made no payments on his student loans until after he had consulted an experienced bankruptcy attorney is not an indication of bad faith.").

If the Court had found that Mrs. Gill satisfied the first two prongs of *Brunner*, the Court would have concluded that Mrs. Gill failed to meet her burden of proof under the third *Brunner* prong. Upon consideration of the evidence, Mrs. Gill has not convinced the Court that she has made a good faith effort to make payments on the remaining Loan balance. Mrs. Gill's repayment history reveals that the last regular payments on the Loan were made in 2001. No payment history was entered into evidence by either party, and the testimony as to repayment of the Loan is sparse. Mrs. Gill testified that she began repaying the Loan soon after her daughter began college in 1998 and continued doing so until some point in 2001, and she believed that the balance had been reduced from the original principal amount of $15,704.00 to between $11,000.00 and $12,000.00. According to CSLP, the amount of those payments was $204.00 per month.

Taking Mrs. Gill's testimony together with the statements by counsel for CSLP leads the Court to conclude that Mrs. Gill repaid approximately $4,000.00 of the Loan. This is certainly not a paltry sum, as it constitutes approximately one-quarter of the original Loan amount. Further, this amount was not paid over a short period of time, but rather, over approximately three years. The Court is of the opinion, however, that while such amount

56

may constitute "substantial" repayments, any good faith found as to repayment is diminished

by the fact that Mrs. Gill has made no payments on the Loan since 2001. The Court is

mindful of the fact that 2001 and 2002 were pivotal years for the debtors in that Mrs. Gill left

her employment in 2001, and Mr. Gill suffered his accident in 2002. While the latter

circumstance was a factor arguably beyond the debtors' control, it is more difficult to reach

that same conclusion with regard to Mrs. Gill's voluntary termination of her employment,

particularly since Mrs. Gill offered no evidence beyond her own testimony that she was

unable to work during that time period. The Court cannot sanction what appears to be,

without further evidence, willful actions by Mrs. Gill to leave her employment that have at

the very least contributed to her default on the Loan.

Mrs. Gill's efforts regarding securing any deferment, forbearance, or exploring

alternate repayment options appear to be minimal at best. Mrs. Gill's testimony as to her

contact with CSLP was vague, and she was unable to recall her last contact with CSLP. As

to the issue of whether she requested any deferments from CSLP, Mrs. Gill testified that she

was instructed by CSLP to "try to keep up with the interest," but presented no further

evidence as to this point. Further, no proof was submitted to the Court that Mrs. Gill had

attempted to comply with CSLP's instructions to make at the very least the interest payments

on the Loan. Mrs. Gill has also failed to demonstrate that she made any effort to explore

alternate repayment options. While this is not a *per se* indication of lack of bad faith, when

combined with what the Court finds to be sporadic contact at best with CSLP, such findings

do not support a finding of a good faith effort to repay the Loan. *See Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch)*, ___ F.3d ___, No. 04-3125, 2005 WL 1311020, at *5 (6th Cir. June 3, 2005) (debtor's decision to not take advantage of the Income Contingent Repayment plan, "while not a *per se* indication of a lack of good faith . . . is probative of her intent to repay her loans").

Mrs. Gill began repaying the loan in either late 1998 or early 1999. She and Mr. Gill filed bankruptcy in August, 2004. Thus, the Court finds that the length of time between the first student loan payment and the time when Mrs. Gill sought to have the Loan debt discharged does not weigh heavily in favor of finding that Mrs. Gill did not make a good faith effort to repay the Loan. However, in conjunction with the Court's findings under the first and second *Brunner* prongs, Mrs. Gill has also failed to demonstrate that she was unable to make the loan payments from 2001 to the present time because of factors beyond her control.

Mrs. Gill's Loan debt constitutes 29.40%, or approximately one-third, of the total debt in the instant matter.[18] The debtors also scheduled credit card debt in the amount of $34,170.19, which equals 69.65% of the scheduled claims. The remaining 0.95% of the scheduled debt consisted of medical expenses totaling $466.00. Thus, the Loan debt is the second-largest type of debt in the debtors' bankruptcy schedules. This factor, then, weighs

---

[18] The amount of the proof of claim filed by CSLP in this case is $14,427.01. The stipulation of the parties that the balance of the loan, including interest and fees, is $17,400.00; using the stipulated total, the percentage of the Loan to the debtors' other debts would increase accordingly.

against a finding of good faith. While the Loan amount is approximately half of the total credit card debt, the Court finds that the amount, being the second largest type of debt in the debtors' bankruptcy, supports a finding that Mrs. Gill has not proven that she engaged in good faith efforts to repay the Loan.

The issue of whether Mrs. Gill has realistically used all of her available financial resources to pay the debt and whether she has undertaken her best efforts to maximize her financial potential has been addressed above in the discussion concerning the debtors' income.[19] To reiterate, the evidence is sufficiently uncontradicted that a significant increase in Mrs. Gill's income would not wholly inure to the benefit of this or any other creditor. Thus, the Court concludes that, in this particular case and under these particular circumstances, Mrs. Gill has maximized her financial potential, given the extremely unique circumstances facing her.

On the issue of use of all available financial resources, Mrs. Gill has admittedly been paying health insurance premiums for her daughter for a number of years. The facts surrounding this issue have also been addressed above and will not be repeated here. On this issue, given the Court's findings above, the Court finds that Mrs. Gill has not used all of her available financial resources to repay the Loan. This finding should not be taken as one in favor of CSLP on its argument that Mrs. Gill has enough excess funds available to repay the Loan if she were to simply cease paying her daughter's health insurance premiums, because,

---

[19] *See supra*, Part IV.A.1 (discussing maximization of income).

as stated, the income and expenses of the debtors must be examined in totality instead of in

isolation. Rather, in this particular case, additional financial resources have been available

in the time period since Mrs. Gill's last Loan payment that could have instead been used to

repay the Loan. Whether those funds would have been sufficient to pay the Loan payment

in its entirety is not for the Court to decide.

The totality of the circumstances leads the Court to conclude that Mrs. Gill has not

engaged in good faith with regard to repaying the Loan. Therefore, upon consideration of

evidence, the Court finds that Mrs. Gill has failed to sustain her burden of proof as to the

third prong of *Brunner*. While the Loan may constitute *a* hardship to the debtors, the Court

does not find that the Loan constitutes an *undue* hardship. Accordingly, the Court finds that

Mrs. Gill has failed to meet her burden of proof under the test set forth in *Brunner* and thus,

has not proven that repayment of the Loan will cause undue hardship such that the Loan

should be discharged under Section 523(a)(8).

## B. *Partial Discharge*

This Court has considered, though not raised by either party, whether Mrs. Gill is

eligible to receive a partial discharge pursuant to Section 105(a) in the instant matter.

However, based upon the Court's findings that Mrs. Gill has failed to meet her burden of

proof as to any and all of the three prongs of *Brunner* such as to demonstrate undue hardship

under Section 523(a)(8), and upon a review of the pertinent case law, the Court is unable to

fashion such a remedy in this case.

Several courts outside the Fourth Circuit have held that a debtor must prove that undue hardship would result if forced to repay student loans before the bankruptcy court can consider the remedy of partial discharge. For example, the Ninth Circuit Court of Appeals has held that a bankruptcy court cannot invoke its equitable powers under Section 105(a) to allow a partial discharge of student loan debt unless the debtor first meets the requirements under Section 523(a)(8) by showing that undue hardship would result if forced to repay the loan. *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1174-75 (9th Cir. 2003). Section 105(a) permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (2005). However, the court may not exercise its powers under Section 105(a) in a vacuum. Instead, the court must adhere to the principle that the bankruptcy court may only exercise its equitable powers within the confines of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). On this basis, the Ninth Circuit found that, to permit a partial discharge pursuant to the equitable powers under Section 105(a) without first making a finding that the *Brunner* test was satisfied "would then have the very real potential to eviscerate the statutorily-based undue hardship provision." *In re Saxman*, 325 F.3d at 1174. Thus, the court held that "[a] debtor who wishes to obtain a discharge of his student loans must therefore meet the requirements of § 523(a)(8) as to the portion of the debt to be discharged before that portion of his or her debt can be discharged." *Id*. (citing *Rifino v. United States (In re Rifino)*, 245 F.3d 1083 1087 (9th Cir. 2001)). Both the Sixth Circuit and

the Eleventh Circuit Courts of Appeal have reached the same conclusion that was reached

by the Ninth Circuit. *See Miller v. Pennsylvania Higher Educ. Assistance Agency (In re*

*Miller)*, 377 F.3d 616, 621-24 (6th Cir. 2004); *Home Ins. Corp. of Am. v. Cox (In re Cox)*,

338 F.3d 1238, 1242-43 (11th Cir. 2003).

The Fourth Circuit Court of Appeals has not directly addressed the issue of partial

discharge; however, it has implicitly endorsed this remedy. *See Floyd v. Educ. Credit Mgmt.*

*Corp.*, 54 Fed. Appx. 124, 126-27 (4th Cir. 2002) (unpublished) (vacating order of the United

States District Court and finding that the Bankruptcy Court's findings, which granted partial

discharge of student loan, was not clearly erroneous). Several courts within the jurisdiction

of the Fourth Circuit, however, have addressed this issue, holding, similar to the Sixth,

Eleventh, and Ninth Circuits, that partial discharge cannot be permitted under Section 105(a)

unless there is a showing of undue hardship under Section 523(a)(8). Most recently, a matter

was remanded to the Bankruptcy Court for consideration of, among other things, whether a

partial discharge was appropriate if the bankruptcy court concluded that the debtor succeeded

in showing undue hardship would result from repayment of the loan. *Educ. Credit Mgmt.*

*Corp. v. Gouge*, 320 B.R. 582, 587 (W.D.N.C. 2005). A similar conclusion was reached in

*Tennessee Student Assistance Corp. v. Mort (In re Mort)*, 272 B.R. 181 (W.D. Va. 2002),

where the Bankruptcy Court's decision to allow a partial discharge of a student loan debt

where the debtor had failed to show that she made a good faith effort to repay the loan, thus

failing to satisfy the third prong of *Brunner*, was reversed. *Id.* at 185. In so holding, the

District Court stated that if a court allowed a partial discharge without a showing of undue

hardship:

> [Section] 523(a)(8) would be without practical effect. If § 105 allowed a
> discharge without meeting the test of undue hardship, Congress' effort to make
> it harder to walk away from student loans would be thwarted. A "partial
> discharge" under § 105 might include ninety percent of the entire debt, or any
> other suitable portion, so long as the bankruptcy court found it "equitable."
> Such a rule would make the law more unpredictable and results as among
> debtors more inconsistent than at present.

*Id. See also United States Dep't of Educ. v. Blair (In re Blair)*, 301 B.R. 181, 186 (D. Md.

2003) (finding that permitting a partial discharge without a showing of undue hardship

"would chip away at § 523(a)(8); the collective force of such piecemeal exceptions ultimately

would eviscerate the statute").

This Court finds that it would be improper to invoke its equitable powers under

Section 105(a) and grant a partial discharge in the instant matter in light of the Court's

findings that Mrs. Gill has failed to satisfy her burden of proving that she will suffer undue

hardship if forced to repay the Loan. Instead, the Court has found that the debtors have a

surplus of income of at least $50.00 per month and likely substantially more in many

months.[20] The Court has also found that Mrs. Gill's salary varies each month and that the

debtors have additional opportunity within their budget for minimization of expenses,

particularly in the area of grocery expense. On the issue of undue hardship, it is also worthy

to reiterate that Mrs. Gill's daughter, who continued to live with the debtors at the time of

---

[20]  *See* Part IV.A.1, *supra.*

the trial, does not contribute anything toward household expenses, save $35.00 toward her cell phone expense. Even a nominal contribution to offset her occupancy and use of utilities could make great headway toward her mother's repayment of the Loan that was obtained to provide an educational opportunity for her.

Finally, it should also be pointed out that the amount of student loan debt in this case is significantly less than which courts normally examine. *See, e.g.*, *Floyd*, 54 Fed. Appx. at 125 (approximately $28,000.00 in student loan debt); *Gouge*, 320 B.R. at 584 (approximately $88,000.00 in student loan debt); *Lohr v. Sallie Mae (In re Lohr)*, 252 B.R. 84, 86 (Bankr. E.D. Va. 2000) (seeking to discharge $35,000.00 in student loan debt).

Therefore, the Court concludes that Mrs. Gill has failed to sustain her burden of proving that even a portion of the Loan debt should be discharged because she has failed to show that undue hardship would result from repayment of even a portion of the Loan.

## V.

## SUMMARY

The tragedy of Mr. Gill's injury is profound. His efforts to remain active and contribute to his community are admirable and remarkable given the disability that has befallen him. This Court, however, must dispassionately weigh the current financial circumstances of Mr. Gill and Mrs. Gill to determine not whether fate has unfairly touched their family, but instead whether the repayment of this student loan casts an undue hardship upon them. Influential, as oft repeated here, are the substantial sums expended monthly by

64

Mr. and Mrs. Gill for the support of her emancipated daughter. Further consequence is given to the fact that the student loan here, while not insignificant, is in a sum such that an amount realizable from the Gills' family budget, even given Mrs. Gill's effectively part-time work schedule, will amortize the loan over the foreseeable working future of Mrs. Gill.

Accordingly, this Court concludes that Mrs. Gill has failed to sustain her burden of proving, as required by Section 523(a)(8), that she will suffer undue hardship if forced to repay the Loan. Therefore, the underlying debt is nondischargeable pursuant to Section 523(a)(8) of the Bankruptcy Code.

A separate order will issue.

The Clerk shall deliver copies of this Memorandum Opinion to Diane B. Fenton, Esquire, Counsel for the Plaintiff; and Pablo S. Salas, Esquire, Counsel for the Defendant.

Entered:  6/21/05

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

*Entered on docket*
*June 21, 2005*